UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JOSE RAMIREZ ESCOBAR,

    *Plaintiff*,

    v.

MIDLAND CREDIT MANAGEMENT,

    *Defendant*.

No. 3:18-cv-819 (MPS)

## RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

### I.    INTRODUCTION

Plaintiff, Jose Ramirez Escobar, brings this suit against Defendant, Midland Credit Management ("Midland"), alleging that Midland violated the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692 *et seq.* ECF No. 18. The Plaintiff has filed a motion for partial summary judgment as to his claim under 15 U.S.C. § 1692e. ECF No. 51. Defendant has filed a motion for summary judgment as to Plaintiff's claims under 15 U.S.C. §§ 1692e and 1692f, as well as Plaintiff's claim for actual damages. ECF No. 52. For the reasons set forth below, Plaintiff's motion for partial summary judgment is GRANTED and Defendant's motion for summary judgment is DENIED.

### II.    BACKGROUND

The following relevant facts are taken from the parties' Local Rule 56(a) Statements and are undisputed unless otherwise indicated.

Plaintiff Escobar obtained a credit card account, issued by Synchrony Bank, to acquire household items at P.C. Richard. ECF No. 54-1 at 1; ECF No. 51-5 at 4; *see also* ECF No. 52-4 at 38-39; ECF No. 59-1 at 1. Escobar defaulted on a debt on this credit card in the amount of

$1,651.24, which was later charged off and sold to Midland Funding LLC.[1]  ECF No. 59-1 at 1-2; ECF No. 52-5 at 2.  After Midland was unable to collect this debt, it sent the debt to a law firm, London & London, on April 23, 2017.  ECF No. 54-1 at 2; ECF No. 51-6 at 8-9.  London & London initiated efforts, including litigation, to collect this debt from Escobar starting on April 24, 2017.  ECF No. 54-1 at 2; ECF No. 51-7 at 1-2.  London & London later withdrew the litigation as part of a settlement due to Escobar's payment of the debt.  ECF No. 54-1 at 3.  More specifically, as part of the settlement, Escobar, on August 21, 2017, sent a personal check in the amount of $1,150 to London & London, which received and deposited it two days later.  ECF No. 54-1 at 3-4; ECF No. 51-6 at 10.  Law firms retained by Midland, such as London & London, "do provide daily balance updates" to Midland upon "receiving payment" from debtors, and thus Midland "should have been" informed of Escobar's payment as of August 24, 2017.  ECF No. 54-1 at 4; ECF No. 51-6 at 13-15.  By August 31, 2017, Midland knew "with certainty" that it had received Escobar's payment in "full settlement" of his debt.  ECF No. 51-6 at 16 (Midland's corporate representative testifying that "[i]t's marked as a [sic] settled in full for less than the full balance."); *see also* ECF No. 52-6 at 48-49 (noting that August 31, 2017 is "the date we posted it," "not necessarily the date we received it" and explaining that "typically there is an approximate seven days between when we [Midland] are notified of the payment [of a debt by a consumer] and when our posting process picks it up and places it in the system.").

---

[1] I use the term "Midland" to refer to the Defendant Midland Credit Management (also referred to as "MCM" in the record) throughout this ruling.  As described in the deposition of Midland's corporate representative, Midland Funding LLC is the legal entity that purchased Escobar's debt from Synchrony Bank.  Midland is a "debt servicer" that sought to collect Escobar's debt on behalf of Midland Funding LLC.  ECF No. 51-6 at 4-6 ("MCM is a debt servicer."; "MCM was servicing the account on behalf of Midland Funding.  Midland Funding had purchased the account.  And then MCM was responsible attempting to collect on the debt from Mr. Escobar . . . .").

On August 25, September 8, and September 22, 2017, Midland voluntarily reported Escobar's account to credit reporting agencies ("CRAs") as "assigned to internal or external collections," which was the same status Midland had reported for the previous few months. ECF No. 54-1 at 5; ECF No. 51-8 at 1.  Midland closed Escobar's account on September 25, 2017.  ECF No. 52-5 at 7;  ECF No. 59-1 at 5.  On October 9, 2017, Midland reported to the credit reporting agencies that Escobar's account was "paid with less than full amount."  ECF No. 54-1 at 6-7; ECF No. 51-8; *see also* ECF No. 59-1 at 5.

Once Midland receives notification from its law firm that a payment is received, it makes a notation in its system, which includes the date the law firm received payment.  ECF No. 52-6 at 20-21.  For payments made by personal checks, like that from Escobar, Midland has a 30-day waiting period before closing the consumer's account.  ECF No 59-1 at 4; ECF No. 52-6 at 19.[2] During this waiting period, Midland continues to submit credit reports twice a month until the account is closed.  *See* ECF No. 54-1 at 6 ("[C]onsistent with its bi-monthly reporting cycle, [Midland] continued to report Escobar's account as 'assigned to collections' on August 25, 2017; September 8, 2017; and September 22, 2017.").

## III.    LEGAL STANDARD

"Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v. Cotton*, 572 U.S. 650 (2014) (internal quotation marks and citations omitted).  In reviewing the summary judgment record, a court must "construe the facts in the light most favorable to the

---

[2] Escobar disputes that Midland has a 30-day waiting period.  Instead, he asserts that Midland has only a 21-day waiting period and points to Midland's "Standard Operating Procedures" manual, which indicates that it will "hold the full payment for 21 days prior to updating the Account as paid in full."  *See* ECF No. 59-1 at 4; ECF No. 60 at 1. For the reasons discussed below in Part IV, this distinction is immaterial.

3

nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). "A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

## IV. DISCUSSION

In this case, both sides have moved for summary judgment, and while each party disputes a few of the other's characterizations of the facts, neither contends that there is a genuine issue for trial as to Escobar's claim under 15 U.S.C. § 1692e. *See* ECF Nos. 51-1 at 7; 52-1 at 6. In addition, Midland has moved for summary judgment as to Escobar's claim under 15 U.S.C. § 1692f and as to his claim for actual damages. ECF No. 52-1 at 6-7. Plaintiff objects, arguing that he has "demonstrate[d] that the credit reporting of the Defendant violates the FDCPA[,]" including § 1692f, ECF No. 59 at 7, and that "[q]uestions of fact" remain as to Plaintiff's actual damages, ECF No. 59 at 25. I agree with the parties that no genuine issue of material fact exists as to Plaintiff's claim under § 1692e, and I agree with the Plaintiff that the undisputed material facts demonstrate that Midland violated 15 U.S.C. § 1692e when it falsely reported to CRAs Escobar's satisfied debt as in a collection status on August 25, 2017, September 8, 2017, and September 22, 2017. In addition, I agree with Plaintiff's argument that Midland has failed to meet its burden under Rule 56. A reasonable jury could find that Midland violated section 1692f

4

on the current record, and, in any event, Midland is liable for its violation of section 1692e and the actual damages must be determined by a factfinder.

### A.       Statutory Framework

The FDCPA was enacted "to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692(e); *see also Simmons v. Roundup Funding, LLC*, 622 F.3d 93, 96 (2d Cir. 2010) ("The FDCPA . . . was designed to protect against the abusive debt collection practices likely to disrupt a debtor's life.") (internal citations omitted). "Because the FDCPA is remedial in nature, its terms must be construed in liberal fashion if the underlying Congressional purpose is to be effectuated." *Vincent v. The Money Store*, 736 F.3d 88, 98 (2d Cir. 2013) (internal quotation marks and citations omitted). The two provisions of the Act involved in this case prohibit debt collectors from: (1) "us[ing] any false, deceptive, or misleading representation or means in connection with the collection of any debt[,]" 15 U.S.C. § 1692e (providing a non-exhaustive list of conduct that violates this section); and (2) "us[ing] unfair or unconscionable means to collect or attempt to collect any debt[,]" *id.* § 1692f (providing a non-exhaustive list of conduct that violates this section).

"To prevail on an FDCPA claim, a plaintiff must prove that (1) [he or] she is a consumer, (2) the defendant is a debt collector, (3) the defendant's challenged practice involves an attempt to collect a 'debt' as the Act defines it, and (4) the defendant has violated a provision of the FDCPA in attempting to collect the debt." *Douglass v. Convergent Outsourcing*, 765 F.3d 299, 303 (3d Cir. 2014). "The FDCPA is 'a strict liability statute' and, thus, there is no need for a plaintiff to plead or prove that a debt collector's misrepresentation of a debt obligation was

intentional." *Vangorden v. Second Round, Ltd. P'ship*, 897 F.3d 433, 437-38 (2d Cir. 2018); *see also Wise v. Zwicker & Associates, P.C.*, 780 F.3d 710, 713 (6th Cir. 2015) ("Under the FDCPA, a plaintiff does not need to prove knowledge or intent to establish liability, nor must he show actual damages, which places the risk of penalties on the debt collector that engages in activities which are not entirely lawful, rather than exposing consumers to unlawful debt-collector behavior without a possibility for relief.") (internal quotation marks and citation omitted). "[A] single violation of the FDCPA is sufficient to impose liability." *Castro v. Green Tree Servicing LLC*, 959 F. Supp. 2d 698, 707 (S.D.N.Y. 2013).

In evaluating FDCPA claims, courts in the Second Circuit use "an objective standard based on whether the 'least sophisticated consumer' would be deceived by the collection practice." *Maguire v. Citicorp Retail Servs., Inc.*, 147 F.3d 232, 236 (2d Cir. 1998); *see also Clomon v. Jackson*, 988 F.2d 1314, 1318 (2d Cir. 1993) (holding that the least sophisticated consumer standard applies to whether § 1692e has been violated). The goal of this standard is to protect those consumers "most susceptible to abusive debt collection practices," but courts are "careful not to conflate lack of sophistication with unreasonableness." *Ellis v. Solomon & Solomon, P.C.*, 591 F.3d 130, 135 (2d Cir. 2010) (citation omitted); *see also id.* ("The hypothetical least sophisticated consumer does not have the astuteness of a Philadelphia lawyer or even the sophistication of the average, everyday, common consumer, but is neither irrational nor a dolt." (internal quotation marks omitted)). As a result, "the FDCPA does not aid plaintiffs whose claims are based on bizarre or idiosyncratic interpretations of collection notices." *Id.* (internal quotation marks and citations omitted). In addition, because the least sophisticated consumer standard is objective, the determination of how the least sophisticated consumer would view a defendant's communication is a question of law suitable for resolution on a motion for

summary judgment. *See Castro*, 959 F. Supp. 2d at 707 (citing, *inter alia*, *Schweizer v. Trans. Union Corp.*, 136 F.3d 233, 237-38 (2d Cir. 1998)); *see also Ellis*, 591 F.3d at 135 (affirming district court's grant of summary judgment to plaintiff on its FDCPA claim under 15 U.S.C. § 1692g, where the trial judge resolved the "least sophisticated consumer" standard as a question of law).

**B.      The Undisputed Facts Support the First Three Elements of Escobar's Claim**

As an initial matter, the parties agree – and so do I – that Escobar is a "consumer" and that Midland is a "debt collector" as defined under the FDCPA.  ECF No. 54-1.  The FDCPA defines "consumer" as "any natural person obligated or allegedly obligated to pay any debt."  15 U.S.C. § 1692a(3).  Plaintiff is a natural person who was obligated to pay a debt to Synchrony Bank.  ECF No. 54-2 at 1; ECF No. 51-5 at 4, 6.  Thus, Escobar is a "consumer" as defined under the FDCPA.  The FDCPA defines a "debt collector" as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another. . . ."  15 U.S.C. § 1692a(6).[3] Midland is such a "debt collector" because it is a "debt servicer" that seeks to collects debts owed to another, i.e., Midland Funding LLC.  *See* ECF No. 54-2 at 1-2; ECF No. 51-6 at 4-6.

The parties disagree as to the third and fourth elements of Escobar's FDCPA claim, i.e., (3) whether Midland's reports to the CRAs that Escobar's debt was still in collection status – after Escobar had satisfied the debt – involved an attempt to collect a debt; and (4) whether

---

[3] The Act provides a number of exceptions to this definition, none of which are relevant here.  *See* 15 U.S.C. § 1692a(6).

Midland's conduct violated a provision of the FDCPA.  *See Douglass*, 765 F.3d at 303.  I begin with the third element – whether Midland's conduct involved an attempt to collect a debt.[4]

Midland argues that its policy of reporting to CRAs twice per month the status of the debts it seeks to collect is designed "to comply with the law and not as a means of inducing or threatening consumer[s] to pay their debts."  ECF No. 54 at 12.  Midland points to the deposition of its corporate representative, Bernadette Canez, who testified as follows:

> We do not use credit reporting as part of our collection strategy. It's not something that we proactively advise the consumer of. So it's not -- the best way to describe it is we don't use it as a carrot or a stick. We don't dangle it in front of the consumer as [a] benefit or a potential risk to their credit. We don't speak about it either way. We provide factual information about it if the consumer were to request information. We don't use it as a threat or a tactic when attempting to collect from the consumer.

ECF No. 52-6 at 15-16.  The problem with Midland's argument is that relies on Midland's own subjective intent, which is irrelevant here.  Whether a communication is sent in connection with the collection of a debt "is a question of fact to be determined by reference to an objective standard."  *Hart v. FCI Lender Servs., Inc.*, 797 F.3d 219, 225 (2d Cir. 2015).[5]  Courts must ask whether "a consumer receiving the communication could reasonably interpret it as being sent 'in connection with the collection of a debt,' rather than inquir[e] into the sender's subjective purpose."  *Id.*; *see also id.* ("An objective standard that determines the apparent purpose of a communication with an eye towards a consumer's understanding also aligns with our teaching that the FDCPA is 'remedial in nature, [and] its terms must be construed in liberal fashion if the underlying Congressional purpose is to be effectuated.'"); *Ruth v. Triumph P'ships*, 577 F.3d

---

[4] This third element focuses on the following italicized language of the two provisions of the FDCPA involved here: (1) whether Midland used "any false, deceptive or misleading representation or means *in connection with the collection of any debt*," 15 U.S.C. § 1692e (emphasis added); and (2) whether Midland used "unfair or unconscionable means *to collect or attempt to collect any debt*", 15 U.S.C. § 1692f (emphasis added).

[5] The *Hart* court construed the phrase "in connection with the collection of any debt" as it appeared in 15 U.S.C. § 1692g, but the same phrase appears in Section 1692e and a substantively similar one – "to collect or attempt to collect any debt" appears in Section 1692f. *See* note 4, *supra*.

790, 798 (7th Cir. 2009) ("[T]he proper standard [for assessing whether a communication is in connection with the collection of any debt] is an objective one."). In *Hart* the Second Circuit concluded that "an *attempt* to collect a debt . . . qualifies as a communication 'in connection with the collection of any debt.'" *Hart*, 797 F.3d at 226. The *Hart* Court stated that this conclusion "easily accords with the plain meaning of the broad statutory language, as well as with the Act's remedial purpose of halting abusive collection practices and giving debtors adequate information about their rights and obligations." *Id.* In addition, the *Hart* Court agreed with other courts' findings that the "absence of a demand for payment is just one of the several factors that come into play in the commonsense inquiry of whether a communication from a debt collector is made in connection with the collection of any debt." *Id.* at 227 (citation omitted).

As this Court and others have previously noted, "reporting debts to credit reporting agencies is one of the most commonly-used arrows in the debt collector's quiver." *Williams v. Rushmore Loan Mgmt. Servs., LLC*, No. 3:15-CV-673 (RNC), 2018 WL 1582515, at *11 (D. Conn. Mar. 31, 2018) (citation omitted); *see also* Federal Trade Commission, Staff Opinion Letter, 1997 WL 33791232 at *1 (December 23, 1997) ("[D]ebt collectors use the reporting mechanism as a tool to persuade consumers to pay, just like dunning letters and telephone calls."). Communications to credit bureaus that add negative information to a consumer's credit report both inform a consumer of the status of the account and may induce a debtor to pay the debt to remove the negative information from his or her credit report. *See, e.g.*, *Hall v. Sw. Credit Sys., L.P.*, No. CV 17-2631 (BAH), 2019 WL 1932759, at *4 (D.D.C. May 1, 2019) ("Debts are submitted to credit bureaus to impair the debtor's credit score so that, in turn, the debtor is induced to pay the debt."). Indeed, Ms. Canez, Midland's corporate representative, acknowledged as much during her deposition. She admitted that after a consumer sees Midland

9

on his or her credit report, "that triggers sometimes consumers to call Midland concerning whether they owe the debt . . . [and] sometimes [the consumer will] want to make payment so that the item will be removed from their credit report[.]"  ECF No. 52-6 at 16.  Such an inducement of payment amounts to debt collection even though the communication is not made to the consumer.  *See Garcia-Contreras v. Brock & Scott, PLLC*, 775 F. Supp. 2d 808, 826 n.16 (M.D.N.C. 2011) ("To the extent Defendants' position relies upon the assumption that only communications with the consumer can constitute 'collection of the debt,' they have not provided any authority to support it and it is contrary to case law."); *Sullivan v. Equifax, Inc.*, No. CIV.A. 01-4336, 2002 WL 799856 *4 (E.D. Pa. Apr. 19, 2002) ("[R]eporting a debt to a credit reporting agency can be seen as a communication in connection with the collection of a debt . . . subject[ing] a debt collector to liability under the FDCPA.").  Thus, under *Hart*'s objective standard, I find that Midland's reports to the CRAs on August 25, 2017, September 8, 2017, and September 22, 2017 were communications that a consumer could reasonably interpret as being sent "in connection with the collection of a debt."[6]

Midland seeks to resist this conclusion by arguing that some portions of the reports it made concerning Escobar's debt after receipt of his check were required by the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq.  ECF No. 54 at 15 ("MCM's credit reports for August 11, 2017; August 25, 2017; September 8, 2017; and September 22, 2017, each indicated that the

---

[6] Just as the testimony of Midland's corporate representative about the intent behind its reports to the CRAs is irrelevant under the governing objective standard, so is the state of Escobar's knowledge.  Thus, Midland's assertion that "Escobar . . . knew that the MCM debt was paid in full and . . . did not ever check his credit report other than a singular instance, on October 10, 2017, one day after MCM had updated his tradeline to the credit bureaus" is beside the point.  ECF No. 54 at 12.  A consumer in Escobar's position – even one who believed his account fully settled as the result of a negotiated payment for less than the full amount – could reasonably interpret Midland's late August and September communications with the CRAs as an attempt to collect a debt; one reasonable interpretation, for example, would be that Midland was attempting to collect the $600 difference between the original debt and the settled amount.

account was disputed with the 'XB' code in the 'Compliance Condition' column. During this period, therefore, MCM's reporting, was not just voluntary but also mandatory.") (internal citations omitted); ECF No. 52-1 at 21 ("[Midland's] credit reporting for August 11, 2017; August 25, 2017; September 8, 2017; and September 22, 2017 each indicated that Escobar disputed the account, because he did. For [Midland] to report otherwise (or not report at all) would be false and misleading, and likely violate the requirements of the Fair Credit Reporting Act.") (internal citations omitted).[7] Midland points to various credit disputes that Escobar filed with the CRAs' dispute system, including one filed on August 31, 2017. ECF No. 52-6 at 49.

But Midland offers no evidence – and cites no authority – to suggest that its August 25, September 8, and September 22, 2017 reports to the CRAs were themselves mandatory, and in fact has argued throughout its filings that its August 25, September 8, and September 22, 2017 reports were merely consistent with its *internal* policies.[8] The fact that these reports had a mandatory element required by the FCRA – namely that *if* Midland decided to communicate a *voluntary* credit report to the CRAs, *then* it was required to include in that report that Escobar's debt was disputed – does not make Midland's reporting to the CRAs any less voluntary. Because Midland was not required to make these reports, a consumer could reasonably interpret them as an attempt to collect a debt.

---

[7] In its reply brief in support of its own motion for summary judgment, Midland – for the first time – argues that "Escobar also neglects to tell this Court that [Midland's] credit reporting on August 25, 2017, September 8, 2017 and September 22, 2017, was in direct response to his credit reporting disputes." ECF No. 62 at 4 (emphasis in original). Midland later retracted this assertion and reverted to its prior explanation in response to "Plaintiff's alleg[ation] that this is a 'false' statement because it is not supported by the underlying discovery." ECF No. 63 at 1.

[8] Ms. Canez testified that she believed that although "[w]e are only required to report [to CRAs data concerning outstanding debts owned by Midland Funding] once a month as part of our consumer first approach," Midland's practice is to make these reports twice a month. ECF No. 52-6 at 13-14. Ms. Canez was "not sure where that requirement [to report to CRAs once a month] comes from," *id.* at 15, and Midland cites no authority for such a requirement in its brief.

By contrast, Midland was required separately to respond to each of the disputes Escobar initiated, *see* 15 U.S.C. § 1681s-2(b) (requiring furnishers of information to CRAs to conduct investigation and report results to CRA when notified by CRA of dispute by consumer); but it is clear from the testimony of Midland's corporate representative that these statutorily required responses were distinct from the August 25, September 8, and September 22, 2017 voluntary reports. *See* ECF No. 52-6 at 49-54 (explaining Midland's response to Escobar's August 31, 2017 dispute filed through the e-OSCAR system). With regard to Escobar's August 31, 2017 dispute, Midland acknowledged receipt of that dispute to the CRA on September 4, 2017, *id.* at 50 ("[Escobar's e-Oscar dispute] was not actively worked, it looks like, until September 4[th], 2017. . . . So based on the notes, it looks like we used a code 22. My understanding is that code means that we acknowledged receipt of the dispute."), but did not respond to the CRA again until November 1, 2017, *see* ECF No. 52-5 at 7 (recording (1) "EOSCAR RESPONSE CODE USED: 22" on September 4, 2017; and (2) "EOSCAR RESPONSE CODE USED: 24" on November 1, 2017). Putting aside the accuracy of these responses,[9] it is clear that they were mandatory and thus not an attempt to collect the debt. *See Edeh v. Midland Credit Management, Inc.*, 748 F. Supp. 2d 1030, 1035-36 (D. Minn. 2010), *aff'd*, 413 Fed. Appx. 925 (8th Cir. 2011) (per curiam) ("distinguish[ing] Midland's *reporting* the debt to the CRAs on its own initiative from Midland's *verifying* the debt after receiving notification from the CRAs that Edeh had disputed the debt[,]" and granting summary judgment to Edeh on the claim that reporting violated § 1692g and to Midland on the claim that verifying violated § 1692g); *see also McIvor v. Credit Control Services, Inc.*, 773 F.3d 909, 915 (8th Cir. 2014) (affirming *Edeh*'s reasoning as applied to §

---

[9] Ms. Canez testified that in the September 4, 2017 response, Midland reported that "the account was still in active collections" and that the balance was approximately $600, reflecting the difference between the original amount owed and Escobar's settlement payment. ECF No. 52-6 at 54.

1692e and noting that "[t]he distinction between voluntary and required communication with consumer reporting agencies is significant."). But that does not alter my conclusion as to the August 25, September 8, and September 22, 2017 reports, which were, for the reasons discussed above, attempts to collect a debt.

### C. The Undisputed Facts Show that Midland Violated 15 U.S.C. § 1692e

Having found that Escobar has satisfied the first three elements of his FDCPA claim, I now turn to the fourth – whether Midland violated a provision of the FDCPA in attempting to collect the debt. In his motion for partial summary judgment, Escobar argues that Midland's reports to the CRAs showing Escobar's debt as in collection status on August 25, September 8, and September 22, 2017, were false in violation of 15 U.S.C. § 1692e, which, as noted prohibits the use of "any false, deceptive, or misleading representation or means in connection with the collection of any debt." Section 1692e includes a non-exhaustive list of prohibited practices. *Id.* Escobar asserts that Midland's reporting of his debt as being in collection after receipt of his settlement check fits three of these:

(2) The false representation of—

(A) the character, amount, or legal status of any debt;

[. . .]

(8) Communicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed.

[. . .]

(10) The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.

15 U.S.C. §§ 1692e(2), (8), (10). The undisputed facts show that Midland's conduct violated each of these subsections.

13

First, Midland's August 25, September 8, and September 22, 2017 reports to the CRAs each contained a "false representation of . . . the character, amount, or legal status of" Escobar's debt. 15 U.S.C. § 1692e(2). Specifically, each represented that the debt was "assigned to internal or external collections," ECF No. 51-8 at 1, when in fact it had been paid in an amount Midland considered to be a "settlement in full." ECF No. 51-6 at 16. A "full settlement" of a debt means nothing more is owed, *see, e.g.*, *Gilreath v. Sentry Ins. Co.*, 450 A.2d 873, 874 (Sup. Ct. App. Sess. 1982) ("The cashing of a check expressly sent in full settlement of a disputed claim[] operates as an accord and satisfaction if, at the time, no word of dissent is sent to the party offering it in satisfaction. . . . [I]t makes no difference that the creditor did not know that the effect of cashing the check . . . would be the discharge of his entire claim." (internal quotation marks omitted)), which is obviously inconsistent with describing the debt as "assigned to collection." "A debt's character encompasses whether the debt actually is due." *See Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 395 (4th Cir. 2014) (upholding judgment in favor of plaintiff for claim under section 1692e(2) concerning false representation that debt had not been satisfied). And as explained above, it does not matter whether Midland knew these representations were false. *Vangorden*, 897 F.3d at 437-38; *see also Alston v. Central Credit Svcs., Inc.*, 2013 WL 4543364 * 4 (D. Md. Aug. 26, 2013) ("The language of the statute does not require a plaintiff to establish that a defendant acted with intent to represent falsely or with knowledge of the falsehood."). At a minimum, Midland's August 25, September 8, and September 22, 2017 reports to the CRAs were misleading, as the Second Circuit has construed that term in the context of the FDCPA. *See Vangorden*, 897 F.3d at 442 ("A collection notice can be misleading if it is open to more than one reasonable interpretation, at least one of which is inaccurate . . . . [E]ven a partial misstatement of a consumer's debt obligation can be misleading under the FDCPA. . . . The conclusion applies

14

with even more force where a collection notice does more than misstate the extent of a consumer's debt obligation; it misstates the very existence of such an obligation.") (internal citation omitted).

Midland also violated subsections e(8) and e(10).  As already shown, Midland made "use of [a] false representation . . . to . . . attempt to collect [a] debt . . . ."  15 U.S.C. § 1692e(10).  And as discussed in my denial of Midland's motion to dismiss and above, Midland's reports to the CRAs constitute a "communication . . . to any person" within the meaning of subsection e(8). Further, to the extent that subsection adds a knowledge standard, that too is satisfied by the record. Midland's corporate representative testified that by August 25, 2017, Midland *should have known* that it had received Escobar's payment satisfying his debt, and by August 31, 2017, Midland actually knew this "with certainty."  ECF No. 51-6 at 16.  Thus, I find that Midland's reporting of Escobar's debt on August 25, 2017, September 8, 2017, and September 22, 2017 violated 15 U.S.C. § 1692e.

Midland's arguments to the contrary lack merit.  First, Midland argues that Escobar *himself* could not have been misled by Midland's credit reporting.  ECF No. 54 at 5, 16-18.  This does not help Midland, because the test is not whether *Escobar* was *in fact* misled but, rather, whether Midland's communications were false, deceptive, or misleading based on the "least sophisticated consumer" standard.  And they plainly were, because the only reasonable interpretation of Midland's August 25, September 8, and September 22, 2017 reports is that Escobar still owed a debt that he did not.  *See Vangorden*, 897 F.3d at 442 (holding that, where a debt collector allegedly sent a collection letter to a debtor demanding payment for debt that was settled approximately five years earlier, the collection notice was misleading under the "least

sophisticated consumer" standard because the "only interpretation [of the letter indicating that the consumer owed a debt she did not] is misleading").[10]

Midland's argument that its 30-day waiting period is "consistent with industry practice" does not help it either.  First, Midland points to no evidence that its policy reflects practice within the debt collection industry and fails to explain why any such consistency would be a relevant consideration.  Instead, it points to various 30-day and other periods in other, mostly unrelated statutes: (1) section 1692g's 30-day validation period (designed to protect consumers, not debt collectors); (2) the 30-day notice-of-dishonor period under the UCC; (3) bankruptcy cases finding that 30 days is a reasonable time for honoring a check; and (4) Connecticut law regarding when obligations are considered discharged.  ECF No. 54 at 13.[11]  In any case, the FDCPA is a strict liability statute that does not provide any exceptions, as relevant here, to its prohibitions.  Thus, Midland's arguments regarding the purported "reasonableness" of its 30-day waiting period are, at best, a "good faith defense . . . to the alleged FDCPA violation" that "fails as a matter of law . . . because the FDCPA is essentially a strict liability statute."  *Polk v. Legal*

---

[10] I also agree with Escobar – and Midland does not expressly contest (*see* ECF No. 61 at 7; ECF No. 59 at 13-16) – that Midland's reports to the CRAs that Escobar's debt was in active collection, after it was settled, were plainly "material" as the term is construed in the Second Circuit.  *See Garcia v. Law Offices of Howard Lee Schiff, P.C.*, No. 3:16-CV-791 (VAB), 2018 WL 6590356, at *4 (D. Conn. Dec. 14, 2018) ("The materiality requirement shields debt collectors from liability for 'mere technical falsehoods' while still holding them liable for communications and practices that could mislead a putative-debtor as to the nature and legal status of the underlying debt, or that could impede a consumer's ability to respond to or dispute collection.") (citing *Cohen v. Rosicki, Rosicki & Assocs., P.C.*, 897 F.3d 75, 85-86 (2d Cir. 2018)).

[11] Even if the Connecticut law cited by Midland governed here, Conn. Gen. Stat. 42a-3-310, it would not help Midland.  The law provides that "if a note or an uncertified check is taken for an obligation, the obligation is suspended to the same extent the obligation would be discharged if an amount of money equal to the amount of the instrument were taken . . . .  [S]uspension of the obligation continues until dishonor of the check . . . ."  Conn. Gen. Stat. 42a-3-310(b), (b)(1).  This statute would seem to call for a suspension of debt collection activities until Midland received a notice of dishonor, which does not support Midland's assertion that its own practice was "reasonable."  Midland also argues that it cannot be held liable for any "alleged wrongful representations" because Escobar hired a professional credit consultant, Howard Cutler.  ECF No. 54 at 17.  But Cutler is not an attorney, unlike the intermediary in the case cited by Midland (ECF No. 54 at 17) (citing *Vernot v. Pinnacle Credit Services, LLC*, 2017 WL 384327 (E.D.N.Y. Jan. 26, 2017)), and the offending communications were not made to Cutler in any event.  *Vernot*, 2017 WL 384327 * 5 (finding that "the protections of the FDCPA do not apply to communications made by debt collectors *to* attorneys rather than consumers") (emphasis added).

*Recovery Law Offices*, 291 F.R.D. 485, 491 (S.D. Cal. 2013); (citing *Clark v. Capital Credit & Collection Servs.*, 460 F.3d 1162, 1175 (9th Cir. 2006).[12]

Midland is correct that the FDCPA imposed no obligation on it to report Escobar's debt as satisfied immediately upon receipt of his personal check. But once Midland chose to report the status of Escobar's debt by sending a voluntary report to the CRAs, it had an obligation to ensure that its report was accurate and not misleading. The undisputed evidence in the record shows that it failed to comply with that obligation and thus violated section 1692e. I therefore grant summary judgment on liability to Escobar as to his claim under Section 1692e.

**D.      15 U.S.C. § 1692f**

In its motion for summary judgment, Midland argues that its conduct did not violate section 1692f largely for the same reasons it argues that its conduct did not violate section 1692e. *See* ECF No. 52-1 at 25 (arguing that (1) Midland did not use credit reporting "in connection with the collection of any debt"; (2) that Midland followed its internal credit reporting policies; and (3) that Escobar filed credit disputes). I reject these arguments for the same reasons provided above.

As noted above, section 1692f prohibits debt collectors from "us[ing] unfair or unconscionable means to collect or attempt to collect any debt." 15 U.S.C. § 1692f. Like section 1692e, 1692f provides a non-exclusive list of conduct that violates its prohibition,

---

[12] In addition, although Midland did not assert or brief section 1692k's "bona fide" error defense – Midland only asserts that its 30-day policy was "reasonable" – such a defense could not succeed here either. *See Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 604-05 (2010) (holding that the bona fide error defense in § 1692k(c) does not apply to a violation of the FDCPA resulting from a debt collector's incorrect interpretation of the requirements of that statute). A short delay to allow Midland to check with the bank to verify receipt of funds, i.e., that the check did not bounce, might be reasonable if no false reports were made during the delay period. However, Midland offers no evidence that it makes any attempt to check with the bank during the 30-day period. In any event, waiting for a "reasonable delay" period to close an account cannot justify making false statements within the delay period.

including, as relevant here, "[t]he collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." *Id.* at § 1692f(1); *see also Vangorden*, 897 F.3d at 438 (affirming that plaintiff stated a valid claim under the FDCPA when defendant attempted to collect a debt not "expressly authorized by the agreement creating the debt or permitted by law" in violation of § 1692f(1)); *Arias v. Gutman, Mintz, Baker & Sonnenfeldt LLP*, 875 F.3d 128, 135 (2d Cir. 2017) (identifying "collection of an invalid debt" as one of § 1692f's "list of unfair practices"). In addition, the Second Circuit has "recognized that § 1692f's numbered subsections are 'examples' of conduct manifesting the 'unfair or unconscionable' means of debt collection identified in the section's first sentence." *Vangorden*, 897 F.3d at 438 (citing *Gallego v. Northland Grp. Inc.*, 814 F.3d 123, 125 (2d Cir. 2016)). Thus, if a plaintiff establishes that the defendant committed one of the listed unfair practices, no further showing of "unfairness or unconscionability" is required to state a claim under this section. *Vangorden*, 897 F.3d at 438 (citing *Campbell v. MBI Assocs.*, 98 F. Supp. 3d 568, 582 (E.D.N.Y. 2015) (observing that "[b]y its terms, § 1692f(1) prohibits the collection of any amount which is not expressly authorized by the agreement creating the debt or permitted by law," and holding that a § 1692f(1) claim does not require demonstration of violation of "general proscription" on use of "unfair or unconscionable" collection means set forth in first sentence of section)).

Here, Midland's reports to the CRAs on August 25, September 8, and September 22, 2017 were attempts to collect an amount that was not "expressly authorized by the agreement creating [Escobar's] debt or permitted by law." 15 U.S.C. § 1692f(1). There is evidence in the record from which a reasonable juror could conclude that the original agreement creating the debt was superseded and replaced by a "full settlement" of Escobar's debt, ECF No. 51-6 at 16,

under which Escobar paid $1,150 and London & London withdrew the lawsuit.  A reasonable

juror could further find that once Escobar paid the settlement amount, he discharged the

obligation and no further collection activity was authorized.  *See Gilreath*, 450 A.2d at 874.

Thus, I find that a reasonable jury could conclude that Midland's conduct violated 15 U.S.C. §

1692f(1).

### E.    Damages

In his second amended complaint, Escobar seeks actual and statutory damages, among

other relief.  ECF No. 18 at 5.  The FDCPA provides that

> any debt collector who fails to comply with any provision of [the Act] with respect to any
> person is liable to such person in an amount equal to the sum of (1) any actual damage
> sustained by such person as a result of such failure; (2)(A) in the case of any action by an
> individual, such additional damages as the court may allow, but not exceeding $1,000. . .
> . ; and (3) in the case of any successful action to enforce the foregoing liability, the costs
> of the action, together with a reasonable attorney's fee as determined by the court. . . .

*Id.* § 1692k(a).

First, I note that – because I have found that Midland violated section 1692e – Midland is

liable for statutory damages under section 1692k(a)(2) for an amount to be determined at a later

date.  As noted above, a single violation of the FDCPA is sufficient to establish liability.  *See*

*Ellis*, 591 F.3d 133.  The court has discretion as to "whether to award statutory damages under

the FDCPA and the size of the award."  *Savino v. Computer Credit, Inc.*, 164 F.3d 81, 86 (2d

Cir. 1998) (citation omitted).  To calculate an appropriate award of statutory damages up to the

$1,000 statutory cap, the court considers "the frequency and persistence of noncompliance by the

debt collector, the nature of such noncompliance, and the extent to which such noncompliance

was intentional."  15 U.S.C. § 1692k(b)(1).  "Awards of the statutory maximum are typically

granted in cases where the defendants' violations are egregious."  *Cook v. First Revenue*

*Assurance, L.L.C.*, No. 10 CV 5721, 2012 WL 272894, at *2 (E.D.N.Y. Jan. 9, 2012).  However,

a "$500.00 [statutory] award is appropriate where there is no repeated pattern of intentional abuse or where the violation was technical." *Id.*

Likewise, Midland is liable under section 1692k(a)(1) for actual damages sustained by Escobar for its violation of section 1692e. "Actual damages are intended to compensate a plaintiff for out of pocket expenses, personal humiliation, embarrassment, mental anguish, and/or emotional distress that results from a defendant's failure to comply with the FDCPA." *Coles v. Lieberman, Michaels & Kelly, LLC*, No. 10-CV-484S, 2011 WL 3176467, at *3 (W.D.N.Y. July 27, 2011) (internal quotation marks and citation omitted). Although Midland is correct that Escobar did not address emotional damages in his damages analysis, *see* ECF No. 52-18 at 2, Escobar did testify at his deposition that the delay in obtaining a mortgage and purchasing a family home, due in part to Midland's continued derogatory credit reporting after Escobar satisfied the debt, caused him the kind of emotional harm that a reasonable jury could find constituted actual damages under section 1692k. *See* ECF No. 59-4 at 30-31 ("I thought it would take like three months to buy a house, but it took more like six or seven months. More time, and the promise I had made to the family that we are going to have it and I had to keep postponing. I couldn't sleep well and at work. . . . The bank basically turned me down. . . . It embarrassed me, because I wasn't expecting that answer."). At a minimum, there are questions of fact that remain as to the extent of Escobar's actual damages.[13]

Thus, Midland has not met its burden under Rule 56 because a reasonable jury could conclude that (1) Midland's conduct violated section 1692f; and (2) Midland is liable for

---

[13] In so holding, I do not consider the additional affidavits by Escobar and Cutler submitted by Plaintiff's counsel, to which Defendant objects, and thus do not need to decide whether it is appropriate for Escobar to have submitted the affidavits under the Second Circuit's "sham affidavit" rule.

statutory and actual damages sustained by Escobar.  Therefore, Defendant's motion for summary judgment is denied.

## V.     CONCLUSION

For the reasons set forth above, I hereby GRANT Plaintiff's motion for partial summary judgment, and DENY Defendant's motion for summary judgment.


IT IS SO ORDERED.


_____/s/_____
Michael P. Shea, U.S.D.J.

Dated:        Hartford, Connecticut
              September 9, 2020